STEVEN J. OLSON (S.B. #182240)
solson@omm.com
JONATHAN P. SCHNELLER (S.B. #291288)
jschneller@omm.com
MATTHEW R. COWAN (S.B. #281114)
mcowan@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Suite 1900
Los Angeles, California 90071-2811
Telephone: +1 213 430 6000
Facsimile: +1 213 430 6407

*Attorneys for Plaintiffs*
*BYD Motors LLC and BYD America LLC*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BYD MOTORS LLC; BYD AMERICA LLC,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF DEFENSE a/k/a UNITED STATES DEPARTMENT OF WAR;
PETER B. HEGSETH, in his official capacity as Secretary of Defense,

Defendants.

Case No. 2:26-cv-11173

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF**

## INTRODUCTION

1. "Speech on matters of public concern is at the heart of the First Amendment's protection," reflecting "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011).[1] In December 2024, Congress violated that principle, enacting 10 U.S.C. § 4663, a statute that—in combination with Section 1260H of the 2021 National Defense Authorization Act—weaponizes the government's vast contracting power to strip disfavored companies of their First Amendment right to lobby the government. This action challenges § 4663 on its face and as applied to Plaintiffs BYD Motors LLC and BYD America LLC.

2. Section 4663 is designed to force lobbyists to abandon clients the Department of Defense ("DoD" or "the Department") blacklists as "Chinese military companies" ("CMCs") under Section 1260H—a provision enacted to name and shame entities purportedly advancing Chinese military interests. Section 4663 achieves this unconstitutional goal by forbidding the Department from contracting with any company that retains a lobbying firm that also represents a DoD-designated CMC. The statute thus penalizes any lobbying firm representing a CMC by making it toxic to the tens of thousands of prominent companies, universities, and nonprofits that contract with the Department. Because most lobbying firms cannot afford to lose every DoD contractor they represent—and potential business from thousands of others—they have little practical choice but to stop representing designated entities.

3. On June 8, 2026, the Department designated Shenzhen-based electric-vehicle maker BYD Company Limited ("BYD Group") as a CMC. BYD Group is among the world's largest clean-energy companies, with products spanning electric

[1] Unless otherwise noted, all alterations or emphases are added.

passenger vehicles, mass transit buses, and battery technology. Plaintiffs BYD Motors LLC and BYD America LLC (together, "BYD") are California-based subsidiaries that support BYD Group's U.S. operations. BYD operates an electric-bus plant in Lancaster, California, which employs more than a thousand American workers, and sells batteries, solar panels, and energy storage systems to customers across North America. BYD also petitions the government on a wide range of issues affecting its own business interests and those of BYD Group.

4. BYD Group and its subsidiaries develop and market civilian clean-energy technology, with no military products or contracts of any kind. The Department nonetheless recently designated BYD Group as a CMC under Section 1260H. BYD Group is not a military company and has no relationship with any country's security sector. DoD's memo designating it as a CMC does not contend otherwise. Instead, the Department designated BYD Group a CMC based on routine commercial activities and incidental contacts with Chinese regulators—conduct typical of virtually every prominent company that does business in China.

5. BYD Group will seek DoD's reconsideration of its baseless designation. But while that process unfolds, § 4663 has—as intended—silenced BYD's political speech. Like countless companies whose interests are affected by legislative and regulatory developments, BYD has, for years, retained lobbyists to advocate for its interests in the political arena. Those lobbyists have now informed BYD they can no longer represent it due to § 4663. Perversely, the statute thus vitiates BYD's constitutional right to advocate against the erroneous administrative decision that has silenced it. It likewise hampers BYD from advocating its position on other policy matters of public concern—such as pending legislation to ban U.S.-based automakers with Chinese parent companies, bars on the use of federal transit funds to purchase its American-built buses, and agency rulemakings affecting its technological supply chain.

6. This statutory deprivation violates BYD's rights under the First

Amendment. Using lobbyists to communicate BYD's views about important public policy questions is an exercise of the freedoms of speech, petition, and expressive association. Leveraging federal contracts to silence speakers who would otherwise advocate for BYD severely burdens those core First Amendment liberties and is therefore subject to strict scrutiny.

7. But under any applicable level of scrutiny, § 4663 is not adequately tailored to further any valid government interest and therefore violates the First Amendment. The government has claimed that the statute prevents disclosure of sensitive military information to China. But there is zero evidence that lobbying for defense contractors poses risks not adequately addressed by existing criminal laws and regulations governing handling of classified information. Further, § 4663 is not tailored to protect military secrets—it precludes lobbyists representing CMCs from representing any Department contractor on any subject, while leaving unregulated lawyers, accountants, consultants, and countless others who may work for defense contractors. Nor are Section 1260H's designation criteria tailored to data-security interests. Consider that one of DoD's grounds for designating BYD Group is that it became "affiliated with" a Chinese regulator that included BYD cars in a green-vehicle tax-incentive registry. The same registry also listed cars manufactured by Volkswagen, Mercedes-Benz, BMW, Toyota, Tesla, and Honda. Censorship criteria that could, on DoD's reading, sweep in much of the global auto industry do not correspond to any government interest in military secrecy.

8. Because § 4663's entire purpose is to suppress core political speech, it violates the First Amendment in every application. And it is plainly unconstitutional as applied to BYD, whose civilian parent was designated a CMC based on routine commercial activities characteristic of countless Western companies doing business in China.

9. BYD therefore seeks an order declaring § 4663 unconstitutional, enjoining the Department from enforcing § 4663, vacating the Department's

designation of BYD Group, and restoring BYD's fundamental First Amendment rights to freely speak, petition, and associate.

## JURISDICTION AND VENUE

10. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the action arises under the First Amendment of the United States Constitution and the laws of the United States.

11. The Court may grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the Court's inherent equitable power.

12. The United States has waived sovereign immunity under 5 U.S.C. § 702 because Plaintiffs seek no money damages.

13. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because Defendants are a federal agency of the United States and an officer of the United States acting in his official capacity, Plaintiffs reside in this District, and no real property is involved.

## PARTIES

14. Plaintiff BYD Motors LLC is a United States company headquartered in Pasadena, California and organized under the laws of Delaware. BYD Motors LLC manufactures and distributes electric vehicles in the United States.

15. Plaintiff BYD America LLC is a United States company also headquartered in Pasadena, California and organized under the laws of Delaware. BYD America imports, distributes, and services batteries, solar panels, and energy storage systems in North America.

16. Plaintiffs are subsidiaries of BYD Group, a global civilian clean-energy and renewable transportation company headquartered in Shenzhen, China.

17. Defendant U.S. Department of Defense ("DoD" or "the Department") is a department of the Executive Branch of the United States government.

18. Defendant Peter B. Hegseth is the Secretary of Defense and is sued in

his official capacity.

## STATUTORY FRAMEWORK

### A. Section 4663 bars the Department from contracting with companies whose lobbyists represent DoD-designated CMCs.

19. In December 2024, Congress enacted Section 851 of the National Defense Authorization Act for Fiscal Year 2025, entitled "Prohibition on Contracting with Covered Entities that Contract with Lobbyists for Chinese Military Companies." Pub. L. No. 118–159, § 851, 138 Stat. 1773, 1995 (2024) (codified as amended at 10 U.S.C. § 4663).

20. Section 4663 was designed to force lobbyists to stop advocating for any company that the Department designates as a "Chinese military company" under Section 1260H of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021. In introducing the statute in Congress, its sponsor expressed the view that "advocating on behalf of [designated] companies" is "reprehensible," and that therefore "[i]f a lobbying firm chooses to represent a Chinese Military Company . . . they should be barred from representing any companies that contract with the U.S. Department of Defense."[2]

21. To that end, § 4663 commands that "the Secretary of Defense may not enter into a contract with an entity, a parent company of such entity, or a subsidiary of such entity if such entity is a party to a contract with a covered lobbyist." 10 U.S.C. § 4663(a). A "covered lobbyist," in turn, is defined as "an entity that engages in lobbying activities for any entity determined [by the Department] to be a Chinese military company" under Section 1260H. *Id.* § 4663(d)(1). Together, these provisions forbid the Department from contracting with any entity that enters a contract with a lobbyist for a designated CMC.

---

[2] Press Release, Rep. Elise Stefanik, Stefanik Amendment to Force Lobbyists to Choose Between Representing the U.S. or Communist China Is Included in the National Defense Bill (May 2024), archived at https://perma.cc/9WPM-FYWT.

22. By design, that prohibition exerts immense coercive force. The Department is the largest employer in the United States, responsible for feeding, lodging, transporting, equipping, and training almost three million military and civilian personnel. It contracts on a scale no other federal agency approaches: in Fiscal Year 2025, it committed approximately $492 billion to contracts—more than every other federal agency combined.[3] Those contracts go far beyond weapons production or defense, extending to packaged food, consumer products, media, information technology, hospitality, transportation, pharmaceuticals, and higher education. The Department's contractors, which number in the tens of thousands, include not just defense firms such as Northrop Grumman and Boeing but household names across virtually every sector, such as Google, Johnson & Johnson, Hershey, Ford, FedEx, PepsiCo, AT&T, Hilton, Johns Hopkins, Stanford, the Mayo Clinic, and Goodwill.[4]

23. Section 4663 effectively disqualifies a lobbying firm that represents a 1260H-listed company from working for any of those entities. It thus offers lobbyists a choice in name only: either represent a designated company, or keep access to the nation's leading businesses, universities, and nonprofits.

---

[3] U.S. Gov't Accountability Off., A Snapshot of Government-Wide Contracting for FY 2025 (May 5, 2026), archived at https://perma.cc/7Y8C-7N8E (reporting approximately $793 billion in total federal contract obligations for Fiscal Year 2025, of which $491.6 billion is attributable to DoD).

[4] *See* DoD Standards of Conduct Office, DOD Vendors with Contracts over $25,000 for CY 2025 (FY 2024 Data), revised March 2025 (Attached as Exhibit 1); *see also, e.g.*, U.S. Gov't Accountability Off., GAO-22-104154, Defense Industrial Base: DOD Should Take Actions to Strengthen Its Risk Mitigation Approach, Highlights (2022) (noting that "[m]ore than 200,000 companies provide supplies, parts, and manufacturing" for the Department); Defense Industrial Base Sector, Cybersecurity & Infrastructure Sec. Agency, archived at https://perma.cc/XMC9-2U6D ("more than 100,000" companies "perform under contract to the Department of Defense").

### B. The Department has asserted boundless discretion to designate companies under Section 1260H.

24. Loss of access to lobbyists under § 4663 turns not on military ties or Chinese state control, but on the Department's ever-expanding application of Section 1260H's complex criteria.

25. Section 1260H sets forth two grounds for the Department to designate a company as a CMC. First, the statute requires designation of any company found to be "directly or indirectly owned by, controlled by, or beneficially owned by, affiliated with, or in an official or unofficial capacity acting as an agent of or on behalf of" various enumerated Chinese government agencies. § 1260H(g)(2)(B)(i)(I)(aa)–(gg). The relevant forbidden entities include China's principal technology regulator, the Ministry of Industry and Information Technology ("MIIT"); the State-Owned Assets Supervision and Administration Commission ("SASAC"), which oversees state-owned enterprises; and the State Administration of Science, Technology and Industry for National Defense ("SASTIND"), a civilian agency that oversees China's defense-industrial sector and funds academic research.

26. Second, Section 1260H requires CMC designation of any "military-civil fusion contributor to the Chinese defense industrial base." § 1260H(g)(2)(B)(i)(II). The phrase "military-civil fusion contributor" encompasses eight sub-categories, including entities "affiliated with" various Chinese agencies, entities "residing in or affiliated with a military-civil fusion enterprise zone," and "[a]ny other entities the Secretary determines is appropriate." § 1260H(g)(3)(B), (E), (H). The enterprise-zone category alone encompasses a vast number of Chinese and non-Chinese companies—zones deemed "military-civil fusion enterprise zones" by DoD can house "thousands of international consumer-facing companies such as Amazon Web Services, Volvo, Qualcomm, Autoliv, and Continental." *Hesai Tech. Co. v. U.S. Dep't of Def.*, 792 F. Supp. 3d 22, 35

(D.D.C. 2025) (quotation omitted).

27. The Department has taken full advantage of this labyrinthine scheme. It maintains that, under Section 1260H, it is "irrelevant" whether a company "design[s] . . . products for military use,"[5] or whether its contacts with the Chinese government "relate[] to military or defense."[6] And although Section 1260H defines "affiliated with" to require a "close formal or informal association," § 1260H(g)(1), the Department has repeatedly found the required affiliation with a Chinese government entity—and deemed companies CMCs—based on routine regulatory contacts of the sort countless American businesses undertake.

28. For example, in *WuXi AppTec Co. v. U.S. Dep't of Def.*, the Department concluded that a biotech company was "indirectly affiliated" with SASTIND because its subsidiary was listed as a "Third-Party Laboratory" for drug studies conducted at a SASTIND-supervised university. 2026 WL 2279624, at *8–9 (D.D.C. Aug. 7, 2026). As the U.S. District Court for the District of Columbia noted in invalidating the designation, the University of Michigan was listed as the "applicant" for another study involving the same university, so the "Department's logic would make a member of the Big Ten a Chinese military company." *Id.* at *9. Yet § 4663 conditions fundamental constitutional rights on similar designation decisions by DoD.

## FACTUAL ALLEGATIONS

### A. BYD Group is a privately controlled civilian clean-energy company with substantial U.S. operations and no military ties.

29. Plaintiffs are California-based companies that support the U.S. operations of their parent company, BYD Group. BYD Group is a global company

---

[5] Mem. ISO Defs.' Cross-MSJ and Opp. to Pl.'s MSJ at 10, *Yangtze Memory Techs. Co. v. DoD*, No. 1:25-cv-04244 (D.D.C. May 15, 2026), ECF No. 19.

[6] Cross-MSJ and Opp. to Pls.' MSJ at 32, *SZ DJI Tech. Co. v. DoD*, 1:24-cv-02970 (D.D.C. Apr. 4, 2025), ECF No. 36.

focused exclusively on civilian products, including consumer and commercial electric vehicles, electronics, and battery technologies for mass transit and energy storage applications.

30. BYD Group's stock is publicly traded and partly owned by American and international investors. Major U.S. institutional investors, including BlackRock, Vanguard, and Fidelity, maintain stakes in BYD Group. No Chinese state entity controls or directs BYD Group's governance or operations.

31. BYD Group designs, manufactures, and sells products for civilian and commercial use only. The company sells electric passenger vehicles to consumers, zero-emission buses and trucks to transit agencies, and batteries and energy-storage systems to private and public sector customers.

32. BYD Group does *not* design, manufacture, or sell any products for military use. The company has no contracts, interactions, or communications with the Chinese military, holds no certifications or licenses to supply military-grade products to any military, does not entertain inquiries or requests for proposals from the military, does not bid on military contracts, and has never supplied any product to any military end-user, in China or anywhere else.

33. For more than a decade, BYD Group's U.S. subsidiaries have supported American domestic manufacturing and job creation. These include BYD Motors and its subsidiary RIDE Coach & Bus, which since 2013 has operated North America's largest zero-emission electric bus manufacturing facility at its 556,000-square-foot warehouse in Lancaster, California. The Lancaster facility has grown more than five-fold over the last thirteen years, and production capacity is up to 1,500 battery-electric buses a year. Through RIDE, BYD employs about 1,000 people in the United States and indirectly supports another 2,000 jobs in regional logistics, component supply, and the service sector. BYD Group and its U.S. subsidiaries have spent nearly $200 million on components made by American vendors. Over the past decade, they have trained and upskilled thousands of

American workers through workforce-development and apprenticeship programs.

34. BYD Group's U.S. subsidiaries have invested more than $250 million in the United States through their facilities, equipment, and workforce, and are currently planning another $70 million investment in Lancaster—which would create 480 new jobs—as well as an expansion of manufacturing to the East Coast.

35. BYD's U.S.-manufactured buses support American public transportation systems. The company has sold more than 1,000 transit buses to customers across the United States, including public-sector customers in Indiana, Georgia, Tennessee, Louisiana, California, Colorado, and Washington. Daily ridership on BYD vehicles in the United States is estimated at 150,000 to 200,000 passengers.

36. All BYD bus models purchased with federal funds and in service in the United States comply with Buy America guidelines and incorporate nearly 75 percent U.S. components. BYD's American suppliers include Amazon Web Services, Nvidia, and Google, and its American customers and business partners include Microsoft, Amazon Logistics, Anheuser-Busch, Apple, Uber, Exxon Mobil, and Cox Automotive.

**B. BYD has long petitioned the federal government on matters of public concern.**

37. BYD's U.S. business implicates a host of actively debated policy issues, from transportation policy to federal procurement to clean energy. Like nearly every large company whose commercial interests turn on federal policy, it has often retained lobbyists to advocate for its interests before Congress and federal agencies.[7]

38. BYD's advocacy has primarily centered on issues affecting its

[7] The registered lobbyists BYD has retained are required to file quarterly disclosures under the Lobbying Disclosure Act. They include Kadesh & Associates, LLC; Gordon Thomas Honeywell Governmental Affairs; Whitmer &

American-manufactured buses—above all, whether transit agencies, school districts, and other public buyers can use federal funds to purchase them. BYD's lobbyists have thus petitioned the government on federal rules governing bus and railcar purchases, transportation appropriations and infrastructure funding, the Clean School Bus Program under the Bipartisan Infrastructure Law, a union contract at BYD's California plant, agency rulemakings concerning technological supply chains, and more.[8]

39. But the stakes of federal policy for BYD have never been higher than they are today. Over the past decade, Congress and the Executive Branch have progressively walled off the American electric-vehicle market, imposing restrictions on automakers with Chinese ties even when their vehicles are made by American workers in the United States. Federal transit funds cannot currently be used to buy buses or railcars from manufacturers with Chinese parent companies.[9] Tariffs on electric vehicles from China have skyrocketed from 25 percent to 100

---

Worrall, LLC; Crossroads Strategies, LLC; Capitol Counsel, LLC; and its own in-house lobbyist.

[8] *See, e.g.*, Lobbying Registration of Kadesh & Assocs., LLC (LD-1) at 2 (Jan. 9, 2014), https://lda.gov/filings/public/filing/8d676991-e7a4-4319-9916-fb1d7a0f28dd/print/ ("Issues relating to the manufacture of electric buses in California"); Lobbying Registration of BYD Motors LLC (LD-1) at 2 (July 1, 2021), https://lda.gov/filings/public/filing/50612d6f-4c7a-452a-a325-3b3923d4f787/print/ ("Issues related to electric vehicle manufacturing, bus procurement, and transportation infrastructure"); Lobbying Report of BYD Motors LLC, 3d Quarter 2024 (LD-2) at 2 (Oct. 14, 2024), https://lda.gov/filings/public/filing/bc4eb4b0-656b-4837-ad29-d142a6232f6e/print/ (reporting advocacy on "the Clean School Bus Program/Bipartisan Infrastructure Act," on "Union contract at BYD Motors in California," and on federal restrictions on transit vehicle procurement).

[9] National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116–92, § 7613, 133 Stat. 1198, 2314 (2019) (codified at 49 U.S.C. § 5323(u)); *see* H.R. Rep. No. 118-508, at 2 (2024) (Section 7613 prevents federal funding assistance for transit bus and railcar procurements from being allocated to "state owned enterprises (SOE) or state-related enterprises in countries named on certain watch lists," including "entities connected to the Chinese Communist Party (CCP)").

percent.[10] And the Department of Commerce has prohibited manufacturers owned or controlled by Chinese parents from selling vehicles that connect to external networks.[11]

40. Congress is now considering legislation that would go even further. The Connected Vehicle Security Act of 2026 would prohibit "the importation, manufacture, sale, resale, or introduction into interstate commerce in the United States of connected vehicles and related software and hardware associated with foreign adversaries." S. 4429, 119th Cong. (2026). That prohibition would effectively outlaw the battery-electric buses BYD builds in Lancaster. It has passed the Senate Commerce Committee, and an identical bill is pending in the House.[12] Few matters are of greater consequence to the future of BYD's United States operations or to the approximately 1,000 Americans it employs.[13]

41. Equally pressing for both Plaintiffs is advocacy against BYD Group's erroneous designation and its resulting harms. The designation has already caused substantial financial and reputational harm, tarring BYD Group and its subsidiaries as a national-security threat in the eyes of many policymakers. Section 4663

---

[10] Notice of Modification: China's Acts, Policies and Practices Related to Technology Transfer, Intellectual Property, and Innovation ("Notice of Modification"), 89 Fed. Reg. 76581, 76585 (Sept. 18, 2024) (raising Section 301 duties on electric vehicles from 25 percent to 100 percent, effective Sept. 27, 2024), archived at https://perma.cc/U2KR-FXUD.

[11] Securing the Information and Communications Technology and Services Supply Chain: Connected Vehicles, 90 Fed. Reg. 5360 (Jan. 16, 2025) (codified at 15 C.F.R. pt. 791, subpt. D).

[12] S. 4429, 119th Cong. (2026) (reported favorably by the Senate Commerce Committee on July 22, 2026), https://www.congress.gov/bill/119th-congress/senate-bill/4429; H.R. 8730, 119th Cong. (2026) (companion bill introduced May 11, 2026).

[13] The U.S. Trade Representative has also recently raised tariffs on Chinese non-EV lithium-ion batteries, which BYD routinely imports, from 7.5 to 25 percent. *See* Notice of Modification, 89 Fed. Reg. at 76585, 76591 (raising tariffs on lithium-ion non-electrical vehicle batteries to 25 percent, effective Jan. 1, 2026).

prevents BYD from correcting the record on that question, or from retaining experts to help it navigate DoD's obscure decision-making processes as it seeks the agency's reconsideration.

### C. DoD designates BYD Group based on routine commercial contacts.

42. BYD first learned that the Department was considering designating BYD Group under Section 1260H from media reports in November 2025. That December, Senator Rick Scott sent DoD Secretary Peter Hegseth a letter publicly urging him to designate BYD Group. BYD met with DoD on January 22, 2026 to share information establishing why BYD Group does not qualify as a CMC under the Section 1260H criteria. At the meeting, the Department requested information about BYD Group's ownership and asked whether the company had policies prohibiting the unauthorized transfer of products, proprietary information, IP, and data to third parties. BYD promptly responded with a letter detailing BYD Group's ownership structure and explaining its policies prohibiting the unauthorized transfer of the company's products and technology, including for any military use. BYD offered to answer follow-up questions.

43. The Department did not respond. On June 8, 2026, it designated BYD Group and its subsidiaries a Chinese military company under Section 1260H. The Department subsequently provided BYD with a report explaining five grounds for DoD's designation.

44. The first two assert that BYD Group is "affiliated with"—i.e., "in close formal or informal association" with—a Chinese agency enumerated in the statute's first prong. § 1260H(g)(2)(B)(i)(I), (g)(1).

a. First, the Department found the company is directly and indirectly affiliated with SASAC because of its purported participation in a commercial battery-research consortium indirectly overseen by SASAC. As BYD will explain in its upcoming reconsideration request to the agency, the

consortium is merely an industry event whose participants, according to the Department itself, included six of the top ten global automotive battery manufacturers. And BYD Group's "participation" consisted of personnel attending conferences to keep abreast of developments in the field, not any project or collaboration.

b. Second, the Department found an indirect affiliation with MIIT because of a BYD Group subsidiary's facility in an MIIT-supported industrial park. That facility was built for a planned mining-vehicle project that never began production. Moreover, the park spans more than 45 square kilometers and hosts a variety of other businesses that, like BYD Group's subsidiary, have zero military connection.

45. The Department's three other findings assert that BYD Group is a "military-civil fusion contributor to the Chinese defense industrial base" under Section 1260H's second prong. § 1260H(g)(2)(B)(i)(II).

a. The Department again asserted an affiliation with MIIT because the agency listed certain of BYD Group's cars in a catalog of low-emission vehicles eligible for tax reductions—alongside cars made by Volkswagen, BMW, Mercedes-Benz, Tesla, Jaguar Land Rover, Toyota, and Honda.

b. DoD separately also asserted an MIIT affiliation because BYD Group participated in the agency's intelligent vehicle pilot testing program—a mandatory regulatory program that every self-driving vehicle company in China must complete.

c. Finally, the Department found that BYD Group resides in or is affiliated with a military-civil fusion enterprise zone because it maintains facilities in the Xi'an High-Tech Industries Development Zone—which spans more than 100 square miles and houses more than 100,000 enterprises, including facilities for Fortune Global 500 companies such as Amazon, Microsoft, IBM, and Samsung.

46. Nowhere in the memo did DoD assert that BYD ever researched, developed, or sold military products (or sold to military users). Instead, the memo generically asserted that BYD Group and its subsidiaries contribute to the Chinese defense industrial base because BYD Group makes electric vehicles, which the memo deems a critical military technology.

47. BYD Group will vigorously contest the designation through the Department's reconsideration process.

48. But this action presents a different and more fundamental question: whether, having designated BYD Group based on routine commercial and compliance activities, the government may also strip BYD of its First Amendment rights to political speech, petition, and expressive association. That question answers itself.

## FIRST AMENDMENT ALLEGATIONS

### A. Section 4663 has deprived BYD of its advocates.

49. Since § 4663 took effect on June 30, 2026, defense contractors cannot do business with a lobbying firm that also represents a CMC—doing so would forfeit their eligibility to contract with the Department. As a result, lobbyists cannot represent a CMC without forgoing any and all work with DoD contractors. *See supra* ¶¶ 19–23.

50. The statute had its intended effect. To maintain their eligibility for Department contracts, major contractors have required their lobbyists to certify that they do not represent any CMC. BYD Group's designation has thus made BYD untouchable and unable to engage any external lobbyist. Both lobbyists it has worked with for years and ones it has newly tried to retain have informed it that they cannot represent it because of § 4663. BYD has thus been deprived of critical tools to petition the government on critically consequential issues, not least the Department's designation decision itself.

**B. Section 1260H and § 4663 burden core First Amendment rights to speech, petition, and association.**

51. "Speech concerning public affairs is more than self-expression; it is the essence of self-government." *Connick v. Myers*, 461 U.S. 138, 145 (1983). Political speech thus "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* As a form of political speech, "the right to lobby" is not only "constitutionally protected," *Gallinger v. Becerra*, 898 F.3d 1012, 1020 (9th Cir. 2018), but "the sine qua non of democracy," *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1062 (9th Cir. 1998). It is thus "clear that . . . efforts . . . to lobby [government] officials" are "fully protected by the First Amendment." *FTC v. Super. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 426–27 (1990). So too are the closely connected First Amendment rights to "petition the[] government freely" and "associate with others." *First Choice Women's Res. Centers, Inc. v. Davenport*, 608 U.S. 174, 184 (2026).

52. Section 4663's entire purpose is to silence designated entities and those who would speak for them. It achieves that goal by coercing advocates to abandon CMCs. In the words of its sponsor, the statute "forc[es] lobbying firms to choose" between CMCs and any company with a DoD contract. *See supra* ¶ 20. That outcome "restricts political expression" because "it limits the number of voices who will convey [BYD's] message . . . and, therefore, limits the size of the audience [it] can reach." *Meyer v. Grant*, 486 U.S. 414, 422 (1988). And it "limit[s] [BYD's] ability to make" its viewpoints "the focus of [government] discussion." *Id.* This coercive effect on expressive association is a classic First Amendment violation: "Strip away the ability of individuals to work together free from governmental . . . intrusion, and the freedom to associate may become no freedom at all—individuals deterred, groups diminished, and their protected advocacy suppressed." *First Choice*, 608 U.S. at 185–86.

53. The Department has elsewhere argued that these burdens are less

serious because the statute "does not *directly* regulate [CMCs'] expressive conduct."[14] But under the First Amendment, the government "cannot do indirectly what [it] is barred from doing directly: [it] cannot coerce a private party to . . . suppress disfavored speech on [its] behalf." *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 190 (2024). Nor can it "create[] an unnecessary risk of chilling" protected speech, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021), including by enforcing laws that, like Section 1260H and § 4663, "carry with them a 'deterrent effect on the exercise of First Amendment rights,'" *First Choice*, 608 U.S. at 186.

54. That burden remains even if a CMC can speak on its own behalf or might be able to retain a lobbyist unfazed by § 4663. "That [CMCs] remain free to employ other means to disseminate their ideas does not take their speech through [their chosen advocates] outside the bounds of First Amendment protection." *Meyer*, 486 U.S. at 424. The First Amendment protects the "right not only to advocate their cause but also to select what they believe to be the most effective means for so doing." *Id.*

**C. Section 4663 is subject to strict scrutiny.**

55. "Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). That test applies because § 4663 burdens BYD's political speech on matters from clean-energy policy to DoD's administration of the 1260H list. *See Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 528 (1991) ("lobbying conduct . . . entail[s] speech of a political nature").

56. Section 4663 is also subject to strict scrutiny because it is content

---

[14] *See* Defs.' Opp. to Pls.' Mot. for Prelim. Inj. at 6–7, *Alibaba Grp. v. U.S. Dep't of Def.*, No. 5:26-cv-06227-EKL (N.D. Cal. July 21, 2026), ECF No. 34 ("Alibaba Opp.").

based. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A law that "applies to particular speech because of the topic discussed," or that "draws distinctions based on the message a speaker conveys," is content based. *Id.* So is a "regulation that denies one group of persons the right to address a selected audience." *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 384 (1984). Section 4663 denies a single group (CMCs) the right to address a single audience (federal policymakers) about a single subject (policy). And it was proposed on the explicit premise that lobbying for designated entities on any subject is "reprehensible." *See supra* ¶ 20.

57. Section 4663 independently warrants strict scrutiny because it silences a specific group of disfavored speakers: designated companies and their lobbyists. Laws dictating who may speak on a particular issue are subject to strict scrutiny because "restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United*, 558 U.S. at 340.[15] That is plainly the case here.

**D. Section 4663 fails any applicable level of scrutiny.**

58. Under strict scrutiny, the government must show that § 4663 is "the least restrictive means of achieving a compelling state interest." *Ams. for Prosperity Found.*, 594 U.S. at 607. The government cannot make that showing—or even one that would satisfy intermediate or exacting scrutiny.

59. To satisfy strict scrutiny the government must "specifically identify an actual problem in need of solving," and show that "the curtailment of free speech [is] actually necessary to the solution." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011). The Department has claimed that § 4663 furthers an interest in "preventing Chinese military companies from accessing sensitive military information through their relationships with lobbyists." Alibaba Opp. at 17–18.

---

[15] No decision exempts a law from First Amendment scrutiny because it targets U.S. companies with a foreign parent. "[T]he speech protections of the First Amendment at a minimum apply to all persons legally within our borders." *Underwager v. Channel 9 Austl.*, 69 F.3d 361, 365 (9th Cir. 1995).

That justification fails several times over.

60. For starters, there is no evidence of "an actual problem in need of solving"—that lobbyists for defense contractors pose some threat not adequately addressed by criminal statutes and regulations governing handling of classified information. *See, e.g.*, 18 U.S.C. § 793 et seq. (criminalizing unauthorized disclosure of national defense information); 32 C.F.R. Part 117 (National Industrial Security Program Operating Manual) (regulating defense contractors' safeguarding of classified information).

61. But even if the problem were real, § 4663 would not be the least bit tailored to address it. As earlier explained, DoD has given Section 1260H—which triggers the lobbying restrictions—a reading so broad that it would encompass major Western enterprises engaging in routine activities in China. *See supra* ¶¶ 26–28. Censorship based on such sweeping criteria does not reflect any "[p]recision of regulation." *NAACP v. Button*, 371 U.S. 415, 438 (1963).

62. Section 4663's restrictions likewise are not tailored to further information security. If a lobbyist represents a CMC, the statute bars the Department from contracting with *any* company retaining that lobbyist on *any* matter, regardless of whether the defense contract or lobbying involves sensitive information. The statute does nothing to stop lobbyists from disclosing sensitive information to foreign governments or unlisted companies—or even from dropping their defense-contractor clients and taking on a designated company the next day. And the statute says nothing about countless others—from lawyers to engineers—who serve defense-contractor clients. Because § 4663 does not "significantly forward the interests it is said to advance," it "violates the First Amendment." *Nat'l Ass'n for Gun Rts., Inc. v. Mangan*, 933 F.3d 1102, 1121 (9th Cir. 2019).

63. There are obvious "less restrictive alternative[s]" that would better "serve the Government's purpose." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). If Congress believes existing information security laws are

inadequate to protect defense secrets it can bolster them. And if it believes lobbyists pose some unique threat it can mandate procedures for their access to classified information or set cybersecurity standards for lobbying firms that receive such information. Such measures would directly advance information security. Censoring BYD does not.

64. This lack of tailoring would be fatal even if § 4663 were subject only to the "exacting scrutiny" applicable to laws with a "deterrent effect on the exercise of First Amendment rights," *Fresenius Med. Care Orange Cnty., LLC v. Bonta*, 172 F.4th 718, 729–30 (9th Cir. 2026), or to the intermediate scrutiny applicable to content-neutral speech restrictions. Those lower levels of scrutiny at minimum require narrow tailoring to further a real governmental interest. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022) ("to survive intermediate scrutiny, a restriction on speech or expression must be narrowly tailored to serve a significant governmental interest"); *Fresenius Med. Care Orange Cnty.*, 172 F.4th at 730 ("the 'exacting scrutiny' standard . . . requires . . . that the law in question be narrowly tailored to the interest it promotes"). Section 4663 has no tailoring at all.

65. Because these failures are inherent in § 4663's design, they recur in every application of the statute, rendering it facially invalid. A broken clock might be right twice a day, but a speech restriction not tailored to any valid government interest is never constitutional: its defects are "categorical—present in every case." *Ams. for Prosperity Found.*, 594 U.S. at 615. At a minimum, § 4663 is facially invalid because it is unconstitutional in "a substantial number of [its] applications . . . judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

66. That unconstitutionality is especially stark as the statute applies to Plaintiffs, civilian clean-energy companies with no military products, no military customers, and no contacts with the Chinese military. The Department designated

BYD Group as a CMC on the basis of attendance at a research consortium, participation in a mandatory vehicle testing program, and similarly unremarkable contacts and commercial activities. It has made no allegation that BYD Group has participated in any Chinese military or security activities. Maintaining a plant in the same industrial park as Amazon or having vehicles listed in the same catalog as Tesla does not demonstrate any "compelling interest" in barring BYD from petitioning federal officials about matters of public concern.

## **CLAIMS FOR RELIEF**

### COUNT I

### Section 4663 Violates the First Amendment on Its Face

### (Against All Defendants)

67. BYD realleges and incorporates the preceding allegations.

68. A statute is facially overbroad when a substantial number of its applications are unconstitutional judged in relation to its plainly legitimate sweep. *See Ams. for Prosperity Found.*, 594 U.S. at 615.

69. Section 4663, in combination with Section 1260H, is unconstitutional in virtually every application.

70. Lobbying is core political speech and petitioning protected by the First Amendment.

71. Lobbying relationships are also an exercise of the right to expressive association.

72. Section 4663 severely burdens BYD's right to speak, petition the government, and associate with its chosen lobbyists.

73. It also burdens the lobbyists themselves, penalizing them for the content of their advocacy and forcing them to abandon specific disfavored clients.

74. Section 4663 is subject to strict scrutiny because it restricts political speech, because it is content based, and because it singles out a category of officially disfavored speakers.

75. Section 4663 fails any applicable level of scrutiny because it is not narrowly tailored to further any valid government interest, including the Department's asserted interest in preventing designated companies from obtaining sensitive military information through their lobbyists. There is no evidence that lobbyists pose an information security threat. And if there were, censoring designated entities would not be a narrowly tailored means of addressing that threat.

**COUNT II**

**Section 4663 Violates the First Amendment as Applied to BYD**

**(Against All Defendants)**

76. BYD realleges and incorporates the preceding allegations.

77. Section 4663 is unconstitutional as applied to BYD.

78. None of DoD's stated reasons for designating BYD Group as a CMC implicate a valid government interest in regulating BYD's lobbying on subjects such as electric vehicles, federal transit and procurement restrictions, American jobs, import restrictions, and the CMC designation itself.

79. Even if such an interest existed, a sweeping restriction on BYD's ability to retain lobbyists would not be narrowly tailored to further it.

**PRAYER FOR RELIEF**

BYD respectfully prays that this Court enter an order and judgment:

a. Declaring that § 4663, operating in combination with Section 1260H, is unconstitutional on its face.

b. Declaring that § 4663 is unconstitutional as applied to BYD.

c. Preliminarily and permanently enjoining Defendants from enforcing § 4663.

d. Preliminarily and permanently enjoining Defendants from enforcing § 4663 against any entity contracting with a lobbyist who also engages in lobbying activity on behalf of BYD.

e. Vacating BYD Group's designation under Section 1260H.

f. Awarding BYD the costs of this litigation, including reasonable attorneys' fees.

g. Granting such other and further relief as the Court deems just and proper.

Dated: September 25, 2026

STEVEN J. OLSON
JONATHAN P. SCHNELLER
MATTHEW R. COWAN
O'MELVENY & MYERS LLP

By: */s/ Jonathan P. Schneller*

*Attorneys for Plaintiffs BYD Motors LLC and BYD America LLC*